to let folks out there know that we will hear this case, Paterno v. City of New York. I see council are present and ready to argue. And then we will take a brief recess. Judge Parker, Judge Droney, who's participating by video. Oh, by telephone. Okay, sorry. Judge Droney, can you hear us? I can. Great. Good morning. Morning. The three of us will leave the bench and then the panel constituted to hear the rest of the appeals this morning. Judge Newman, Judge Chin and I will return a few minutes after that. But anybody who hasn't signed in can come up and sign in during that period of time. So we're ready to hear argument in Paterno v. City of New York. Good morning, Your Honors. Arthur Schwartz for the appellant. There are four issues in this appeal. The first is whether the publication, and I'm going to focus on Polly Trottenberg's letter, was stigmatizing. The second was there a post-deprivation opportunity for due process. The third, which has to do with the disciplinary action that was taken against Mr. Paterno, was whether his speech that was acted against was protected. And the fourth is was the city's action protected nevertheless by Pickering? Now, Your Honor, the judge in the case below spent a lot of time analyzing this, utilizing just New York defamation law. But in StigmaPlus, it has a broader notion that I think is actually covered by a concept in the defamation law, which is called defamation by implication. But here's this court's language. To establish a StigmaPlus claim, a plaintiff must show the utterance of a statement sufficiently derogatory to injure one's, injure plaintiff's reputation that is capable of being proved false, and that he or she claims is false. What was that statement? Well, that's where the letter, we're focused on the letter from Polly Trottenberg, which is in the record, which we believe, if taken as a whole, and that's where defamation by implication comes in, those statements basically say, and with Mr. Paterno's name in it, that Mr. Paterno was the one responsible for the bad stuff that went on in the Department of Transportation. And it's clearly the intent of the letter, and I think the intent is part of what matters. It's the intent, and this comes out of defamation law, the language as a whole can reasonably be seen as having a defamatory purpose, and that was what was intended. What's interesting to tell, to see about that is the letter itself, it, that was published in the chief newspaper, is then responded to, basically, is responded to by the editor, there's a comment by the editor, it's in the record below the letter, where the editor says, Ms. Trottenberg, Commissioner Trottenberg, says, we're doing all we can, and the editor says, well, then why haven't you fired Paterno? So clearly, the, if you really were doing all you can, you would have fired Paterno. So her letter had its intended purpose, which was to say, all this bad stuff was Mr. Paterno's fault. And we think that that fits into the stigma, the stigma test that this court has set out, and particularly, again, set out in Siegel, where it said, statements, this is at Siegel at 212, statements that call into question the plaintiff's good name, reputation, honor, integrity. We've also said that statements that denigrate the employee's competence as a professional and impugn the employee's professional reputation in such a manner as to effectively put a significant roadblock in the employee's continued ability to practice his or her protect, profession, will satisfy the stigma requirement. And if one, there's no question that that's wrong. Assuming you get over all of that hurdle, how is this a matter of public interest? Well, now we're talking about the speech, with the speech part, his. So after the consent decree is published, and I do want to come back to the Article 78 question. After this letter is published and the consent decree is published, Mr. Paterno goes to his workplace, it's on his day off, he goes to the workplace to talk to some of the employees who are involved, and he talks about, and they have a conversation about the consent decree and is it legitimate? Is it, you know, is it based on fact? Were these guys really, did they really believe that they were discriminated against? And certainly, that's not just a conversation about a personal grievance. That's not someone coming in and saying, I didn't get a long enough lunch hour, or the lunches here taste terrible. This is someone who's discussing with fellow employees a public consent decree that discusses racial discrimination in the workplace. That's protected speech. And he was then brought upon charges for having this conversation with his fellow workers. The pickering part of that, by the way, where the judge talks about how the and the impact of those statements and his conversation is not found anywhere in the entire record, and all plaintiff was charged with was having the conversation. That's all he was charged with. And I want to just get back, go back to the Article 78 question, because here I ask you a question about that, the Article 78. I'm sorry. That's Judge Droney. Yes, yeah, my head. I was looking for a face with a voice. Yes. So the question is, what about the timing of this, though? The motion was June of 2016, but the letter of Trottenberg was a year later, over a year later. How does that show the causation for Stigma Plus? Well, it's clear in Trottenberg's letter where she says, we took this action. That established the connection. She says in the letter, we took this action against Mr. Paterno because of what was developed during the investigation, which we've now signed a consent decree about. Mr. Paterno was not told when he was demoted, you're being demoted because you engaged in racially discriminatory actions. He was just told you're being reassigned to this particular position. And Trottenberg supplies the link in her letter. That's what we would say. But one of the problems is he lost over $60,000 in salary as a result of that. So where's the harm that's caused by the Trottenberg letter? No, the Trottenberg letter affects his reputation. Then we find out that because, and it also has a stigmatizing effect going forward, after being blasted in the newspapers as being a racist administrator, he's never going to get another job, either in or anywhere else, making the kind of money he was making being an administrator, being a high level official. So the stigma, the plus part is not just what happened in the past, but it's also what happens going forward. And what happened, we would submit, cannot be addressed in an Article 78 proceeding because the question for an Article 78 court is simply, was the action of the government arbitrary and capricious? And that's all it is. And if the government came in and said, well, we got testimony from this guy and that guy that said he did something wrong, they would win the Article 78 case. That's not a setting like the one in Siegel, where the employee had, I think, what was called a C31 hearing available under the DOE Department of Education guidelines. There was no such hearing available to Mr. Paterno. So I've reserved some time and I'm going to step in. Thank you, Mr. Schwartz. You've reserved three minutes for rebuttal. Ms. Graves-Pollard. May it please the Court, Barbara Graves-Pollard for appellees. I think it's important to look back at exactly what Mr. Paterno alleged happened here, looking specifically at the facts in the case. Mr. Paterno says that he was one of the primary subjects of a federal probe into racial discrimination. In paragraphs 11 and 12, he makes clear that the city was named in a federal civil rights lawsuit. The city entered into a consent decree in June 2017, and certain victims of discrimination were paid compensation. And all of that happened more than a year after the internal transfer that he never grieved, using the rights available to him outlined in his collective bargaining agreement. And then, now I'm looking at paragraph 33, Mr. Paterno says that he had discussions with co-workers about the consent decree, he denied the city's admissions, and he asked other employees for their views. And finally, paragraph 38, Mr. Paterno retired just as he had planned in May 2018, before he was ever subjected to any discipline in connection with his actions at the Flatland Yards. None of that adds up to either of the causes of action that he alleged in his complaint. I'm not going to spend too much time on the consent decree issue and the stigma plus claim, because Mr. Paterno really doesn't challenge the fact that that is an absolutely privileged litigation document. To the extent that he says Ms. Trottenberg, the commissioner, adopted statements in that decree, only one of those statements is actually about him. She says, and here I'm looking at 120 of the record, in July 2016, DOT removed John Paterno, the main subject of the investigation, from his position, reassigning him to a position without supervisory responsibility and no role in hiring or promotions. That's what he alleges in his complaint, paragraphs 22, 26, 27. And so all of the rest of what he wants to tie, looking backwards, to his demotion, all of that is the kind of negative innuendo that in McGuire v. Warren, this court made clear is not actionable. And again, just briefly, in Mars v. Lindo, this court also explained that the defamation that can form a stigma plus claim has to have occurred in conjunction with a negative employment action. And in Mars v. Valley Stream, five months of a separation between those two events was too long. And here we're at 13 months. Finally, with respect to the available post-deprivation remedy, Siegel v. City of New York is very clear that an Article 78 proceeding in state court would have offered an adequate post-deprivation remedy for an at-will employee. In his briefs, Mr. Paterno just wants to distinguish between himself and an at-will employee. But in this respect, it doesn't matter because he doesn't point to any provision in his collective bargaining agreement. And his grievance procedures are outlined in pages 155 and 156. Nothing gave him a right to a pre-transfer hearing, and he was never denied a pre-transfer hearing that he was entitled to. And then moving finally to the second cause of action. Could I ask about Siegel? But would you agree that Siegel just deals with at-will employees and the district court cases cited by the district court in support of its conclusion are all at-will employee cases? Absolutely, Your Honor. But again, in this specific issue, he's not situated in any way that's materially different from the at-will employee in Siegel because he had no right to a pre-transfer hearing under his collective bargaining agreement. And in fact, his agreement set forth many other robust protections that the employee in Siegel didn't enjoy. But on this issue, he had no entitlement to a pre-transfer hearing. He had up to 120 days after that transfer or any change in his salary to commence a grievance. He didn't. And the fact that he chose not to avail himself either of the CBA provisions or in Article 78 does not give him a federal cause of action. And then moving to his second claim on the First Amendment retaliation, there's absolutely no protected speech alleged in this complaint, and no harm. Mr. Paterno doesn't even attempt to say that he was speaking as a member of the public. And again, looking carefully, not at any extrapolations from what he alleged, but what he actually alleged is that he had discussions, he denied the city's admissions, and he asked other employees for their views. He wasn't speaking to his union members. He wasn't speaking to neighbors. He wasn't speaking outside of the workplace. He was talking about a personal grievance as an employee, and that's not protected speech. And even if it were, he alleges no harm. The only thing he says is that paragraph 49 of the complaint that the city intended to undertake disciplinary or retaliatory action. But that's a vague and conclusory statement that, again, is belied by, well, is undermined by his other allegations because he retired before he was ever subjected to any questions. And we will rest on the arguments in our brief. Thanks, Ms. Gravesbolt. Mr. Schwartz. Your Honors, the court below didn't talk at all about the, and the issue wasn't raised, the availability of the grievance procedure as a remedy for what happened. The question about the fact that he retired about a year after the consent decree was issued, I think it was May the next year. Besides that, it's not in the record. It has no, in fact, that was exactly the reason that he retired is because he was embarrassed. He felt he had no future. But it's not part of the record and certainly shouldn't be any of the, one of the considerations here. The letter itself at A120, which is really the key part of the Stigma Plus case, Commissioner Trottenberg says squarely, she says that, in July 2016, DOT removed John Paterno, the main subject of the investigation, of the investigation from his position, reassigning him to a position without supervisory responsibility, which isn't true, and no role in hiring or promotions. So what she's done is take, and this is, the U.S. Attorney, the city went to Paines to call him Executive Director 2. People were able, perhaps able to figure it out. She decided in this letter to not only label him, to give his name, but also to call him the main subject of the investigation, like this entire problem that was resolved with a major consent decree was John Paterno's problem. And that's the key sentence to me, which is basically saying all of this is his fault. And then it has its effect, it has its intended purpose, because it says, the editor writes back, we continue to disagree with her, meaning Commissioner Trottenberg, that demoting John Paterno was a sufficient action to take, given the egregiousness of his conduct, as cited by the U.S. Attorney's Office. Her intent was to throw the blame onto Mr. Paterno, and we believe that in itself has the impact of a stigmatizing or defamation by implication, which is, if we look at state law, is allowed. Siegel did involve the termination of an at-will employee. Anamone, the other case that the district court relied on, involved an at-will employee. And as I said earlier, Article 78 would not, there would be no way to remedy the publication with an Article 78 procedure. Those two cases had to do with someone who were terminated. He wasn't terminated. He also wouldn't have had a, he didn't, he wasn't given a reason for his demotion. And in the First Amendment, there's no requirement that someone speak as a member of the public, which is what counsel said. An employee has free speech rights, as long as they're talking about a matter of importance to the public. If an employee says, I'm an employee at XYZ Corporation, and they're a bunch of people that discriminate against women, that's a, that's a, that's free speech. He's not talking as a member of the public. Thank you very much. Thank you, Mr. Schwartz. Thank you both. We'll reserve decision in this case. As I indicated earlier, we'll take a brief recess. So, see you in a few minutes.